Good morning. If it pleases the Court, my name is Michael Bigelow and I represent Donna Rowe. The plan is that I'm going to argue for five or six minutes, reserve three, and defer the balance of my time to Ms. Hart, who represents Mr. Kalfsbeek. All right, I'm laughing. You're going to understand why in just a second. Back in the day, there was a guy in Tiburon, had a restaurant, made a fair amount of money. His primary income was bootlegging whiskey. Take the bootleg whiskey, he'd sell it to the railroad people at the railhead in Tiburon, which I think was SP at the time, but I'm not certain about that. He hid the money of his ill-gotten gain in the apartment next door in the stairwell in a cutout. Next day, that money would show up in the till as receipts from sale of hamburgers and Raymond's Fizz. That's money laundering. That is money laundering. What these folks did, what they were convicted of, doesn't even come close. Their transactions, the transactions, were so transparent, a 12th grader could have figured them out. Well, what income do they have besides the car insurance? The additional income, I'm going to defer to Ms. Hart for that. That is an argument that she makes. The source of income, the general source of income, as I understand it, derived from what has been referred to as the scheme. Scheme, meaning the car insurance scheme. I'm sorry. Is that right? I'm sorry. I'm not understanding the court. I apologize. No, I just don't know where the money came from. And you said you understood it came from the scheme. And I said, is that the car insurance scheme? Yes. Yes, as it's alleged. Some of the money, if you will, some of the proceeds from that event, from that corporation, from that scheme, was clearly not illegally obtained. Clearly not illegally obtained. Again, I'm going to leave Ms. Hart to address those issues. But can't you explain that to us a little? It's kind of critical to the case. Again, we've kind of divided the arguments up, and that's what she is dealing with. Maybe you should have reversed who came first, then. Perhaps we should have. Because the point that I'm dealing with, the argument that I am dealing with, has to do with the transactions that led to the money laundering convictions. The government argues that money in the Canadian account, the money later sent to the Kabbalah account, the money later deposited in the other trust account, the second trust account, constitute money laundering events. They argue that the money laundering is evidenced by the intent to conceal from the creditor. But hiding money from a creditor or delaying a creditor in obtaining money believed to be owed to the creditor isn't money laundering. That simply is not money laundering. The transactions, again, could have been followed quite simply, quite easily by a 12th grader with a 12th grade education. The accounts were on the corporation's website. The accounts, there was no design, there was no effort to secrete the money or to reintroduce those funds as anything other than the funds obtained from the, as proceeds, if you will, from the event itself. It just simply, it just simply... What was the purpose of issuing, say, a check to Ms. Rowe? The purpose of issuing the checks was to defray the costs of running the business, to... To defray the business? I mean, it wasn't pretty much... Well, funds were expended from the receipts, from the gross receipts, funds were expended to pay claims. What had Ms. Rowe spent that she was being reimbursed for? Running the office, in her capacity as office manager, I think she... She paid her own, she paid the money and then was reimbursed? Well, she didn't pay the money, but she was working for Calspeak. No, but you just said she was reimbursed, she gets a check from this trust, what was that money coming to her for? It is our submission that she was not involved... No, I'm asking you, what did the money, the check come to her for? What was the purpose of the check? For her, for the work that she did for the corporation. Was it a salary? Salary, bonus, payment, commission, somehow it was... She was just given out to her? For the work that she did, she worked for that... She did a good job, here's some money, is that the idea? That's the way pretty much we all get paid, some more formal... Oh, I don't know, it's not the way the government pays it. Some more formalized than others, I submit that it perhaps was not formal, but even if it were, even if... Do we have any evidence as to why she got that money? I think the trial record is fairly replete with the work that she did on behalf of the corporation. Is there some testimony a corporate officer paid her money for a job she had done? Even at worst case scenario, if it constitutes... You're not answering that question, I guess. No more than I have, Your Honor, and I apologize, but I can't. But even if it constitutes divvying up the receipts from the ill-gotten gain, that's not a money laundering event. And my time is up, and so I shall defer to Ms. Hart. That's fine, thank you. And the Court's questions. Thank you. Good morning, Your Honors. Krista Hart on behalf of Mr. Cole speaking. I'm going to be addressing the source of the funds and whether or not the funds at issue in the money laundering accounts were tied to specified unlawful activity. And it's the defense position, the appellant's position, that it was not, the government did not present sufficient evidence to determine where any of this money came from. First, the general background of the system was that individuals could buy in with a membership fee of about $500. You'd buy into a service, the PSASL service, and that provided membership. And with additional fees, you could have additional services. You could pay for a burial program. You could pay for a hardship program. But what does the evidence show actually was paid for? That's the problem is the evidence doesn't show. Wait, didn't you have some burden to show what the money went for? The burdens on the government to prove that the funds at issue were involved in, came from specified unlawful activity, defense doesn't have a burden to prove a negative. And our argument is that the government did not present sufficient evidence to satisfy the statute. Well, they showed that this money was coming in for car insurance, right? No, actually they didn't. That's part of the problem is they presented about 13 witnesses who testified that they were a part of this program. These, the first 12 that testified, all submitted this money in the late 90s and early 2000. The only evidence we have about any bank accounts are that the Pacific Sierra bank account was opened in May of 2000. So we don't know what happened to any of the money regarding any of these other individuals, where the money went, if it went into a bank account, if it went into a coffee can in someone's backyard. We don't know where the funds went. There was no forensic expert that testified. There were no bank records that were admitted into evidence that said, okay, you know, Ms. Slack was the office executive or office administrator who would open the envelopes along with three other individuals, said she would take out checks, she would, they would be for membership or whatever. We don't know what she did with that money. We don't know where it went. The government is simply assuming that because there is money, it has to be from the illegal car insurance portion of things. But there is no evidence to support that at all. So when the bank account is opened in May of 2000 in the Placer Sierra bank account, we don't know how much money went into that account. We don't know the source of that, the funds that went in there. There's only one other person who testified about giving money to this group, and that was Darren Lewis who testified that in January 7th of 2002, he gave them $500 for the car insurance program. But at that point, by the time 2002, January 2002 had come along, they had closed the Placer Sierra bank account. The money had been moved to Canada. There is no additional information that any money was deposited into the Canadian bank accounts aside from that $150,000 that's the subject of Count 34, which occurred in September of 2001. So there is no link that any of these funds, where they came from at all. So there's no forensic accounting to say that their, you know, income came in for this day or this week or this month, and then there's a corresponding deposit into the bank account in a similar amount. There's nothing to corroborate that. So it's the defense position that the government has not met their burden of proof. There's insufficient evidence to find that the money at issue in the money laundering accounts came from specified unlawful activity. Well, they showed some evidence that they did present evidence that money did come from in the scheme came from the car insurance. And those were the 13 witnesses I spoke about. So the first 12, you know, paid their own. Why isn't that enough to create a reasonable inference that that's where the money came from? Because it's hard to imagine that a $500 check that they gave to this organization in 1996 is still in their bank account in the Placer. Well, first of all, we don't know what banking they were using in 1996. There's no account information about what was occurring in 1996. But I think it's not reasonable to assume that this $500 that this individual gave to this group in 1996 is the same money that was in the Placer Sierra bank account in September of 2001. I don't think that's a reasonable inference. Is that all they showed us, that there was a $500 check from 1996? They have 12 witnesses. There was, let's see, March of 1996. We've got January of 1999, April of 1998, November of 1996, October of 1998, October 1998, March of 2000, January of 2000, 1998, 1999. And then the one that I mentioned, Darren Lewis, who said he gave them a check on January 7th of 2002 in the amount of $500. But at that point, the Placer Sierra bank had been closed. The money laundering count in 34 had already occurred. So that is not relevant to count 34. As to counts 31, 32, and 33, there is no evidence that that money, that $500, was ever put into the account in Canada. There are no bank records to support that. So is there any explanation of where the money came from? The government did not provide any explanation other than they had one office assistant, Cheryl Slack, who testified, and she said that on a daily basis they would open envelopes. The money would be for a general membership or whatever, or for the car insurance. Well, what would be the or whatever? Would they write on the check for or whatever? Well, that is part of the problem, is Ms. Slack is the only person who testified from this organization, and they didn't ask her that question. They didn't present any evidence to support what she did or how they could attribute this money to this, to the car insurance portion of the scheme. So that's what I have for the specified unlawful activity. The only other issue that we raised as far as on behalf of Mr. Culspeak was the Rule 32 violations, which I believe are fully briefed, and unless Your Honors have any questions, I would submit on that. Okay. Thank you. Let's hear from the government. Good morning, Your Honors. My name is Steve Lapham. I was the Assistant U.S. Attorney who handled all of the procedural matters below. I want to start by talking about the defense argument where the funds were derived from, and the first point I want to make is that we're hearing a fundamentally different argument this morning than we heard in the briefs and in the district court. We're now talking about a tracing argument. The defendant is now claiming that we didn't trace the money all the way from 1997, 1998 through to the end. That's not an argument that was ever raised before. Let me address the argument that was raised in the briefs, and that was that the government did not prove that the funds were criminally derived. Your Honors, you may think I was beating a dead horse by talking about the facts of this case at length in the brief and in the excerpt of records, and if so, I apologize for that, but I thought it was necessary to show that the only testimony in this case showed that PSASL derived their revenue from an illegal automobile insurance scheme. There was never any evidence to the contrary. The defendant never argued that to the jury, never argued that to the judge in the Rule 29 motion. In the reply brief, the defendant accuses the government of not understanding its obligations and burden of proof. Your Honor, we understand that the government's burden of proof continues all throughout the trial unless and until the jury returns a verdict of guilty. At that point in time, the burden has shifted because the jury has returned a finding, and that finding can only be overturned if the defendant, who now has the burden, shows that that verdict is one that could not be arrived at by any rational jury. And at that point, it's incumbent upon the defendant to prove the theory of why that could be true. And there is no evidence in the record as to what other possible source of revenue there could be except for this automobile insurance program. And, of course, we, I won't belabor this. You know I've argued in the brief that that argument was waived from the beginning because it was never raised with the district court. The defendant also argues that the, and this would be primarily Ms. Roe's argument, that this was not classic money laundering, that in some way the illegally acquired funds have to be cleansed of their illegal taint. That's not the law at all. The money laundering statute makes it a crime to conceal the nature location, the nature source and location, and that's the key point here. The government would contend that these defendants did all of those things. But the point that I think Mr. Bigelow is overlooking is that location factor. Clearly that was the point of moving the money from the United States to Canada and then back again in frustration of that district court order. It was also, you know, we argued in the district court that the government is not required to show that these were profits, that Santos did not apply to this case. That's because this is a concealment case, right? That's correct. And you only have to look at profits if, as this Court has said, there appears to be a merger issue. There is no merger problem here. These funds were not, the transfer of these particular funds were not part of the, an essential part of the scheme. They came afterwards to divvy up all the proceeds afterwards. So the government contended quite reasonably that they, that the Santos did not apply. Did they only take in $150,000? Was there a larger sum of money that was involved in it? Yes. Yes. And there were different bank accounts over the years. But, of course, we only needed to focus for the money laundering purposes on the last couple of bank accounts. They were paying out claims from time to time. We mentioned that in our brief. So money would come in, money would go out. Money would also go to some of the co-conspirators. Amy Polnoff, who is not mentioned in this appeal, was the president of PSASL. And she derived a substantial sum of money on her own. She would treat the PSASL credit card as if it were her own personal expense account. It wasn't necessary to get into all that for the purpose of this appeal. But we maintained that it was not, that Santos did not apply. The judge, out of an abundance of caution, I think, gave the Santos instruction, and the jury so found. So, again, we have a situation where the defense has the burden of showing that no rational trier of fact could have come to that conclusion, that these are profits. And just to trace this through, we're talking about four money laundering transactions. We've already talked about the one that frustrated the search for the money by the district court. The other three were not only designed to conceal the location, but to conceal the nature, source, and ownership of these funds. Because you'll remember that these funds came back to the United States from Canada, but they didn't go to an account called PSASL. They went to an account called the Acabio Trust. And so the three money laundering transactions from there went to named defendants in this case. And from any outside person looking in, they would not be able to determine that the original source of these funds were PSASL. They would look at this and say, oh, the funds come from something called the Acabio Trust. It's a trust disbursement. And that's in addition to frustrating the court in finding out the location of these proceeds. So I would say this is classic money laundering. Your Honor, I'll just say one final thing, and that is about the courts not advising Mr. Calspeak of his whether asking him whether he had reviewed the pre-sentence report. The government has argued that that was an error. The court forgot to do that. I forgot to remind the judge to do that. But it's clear that the defendant did review that pre-sentence report. He makes comments about the pre-sentence report. And more to the point, in this court, the defendant has made no claim of what would have been different, what objections he would have raised had he had an opportunity to do so. And I think the fact that he has not done that, as this court has ruled, is harmless error. And the court did, the district court did address his objections, and I addressed that in my brief. I won't go over that again unless the Court has any questions. I have one comment on the sentence. It's a 10-year sentence for Mr. Calspeak. Is that correct? Yes. And he's now 71? Yes. So until he's 81. And the court found that he had not been motivated by greed. He was just sort of, he had a delusion that this was somehow proper to do. It's a very odd sentence. Now, I don't know that you have anything to do about it, and it's a little bit late to try to do anything, but I offer that comment that 10 years at the age of 71 for this kind of crime is a very severe sentence. And, Your Honor, I don't disagree with that. However, the conduct, the court found essentially that the conduct was motivated not by greed, but by these bizarre political beliefs. It's sort of crazy, but, you know, there are lots of crazy people. I'm not hoisting up on them. Not so crazy. I mean, this sovereign citizen mentality is something we're seeing quite a bit more. I tried a case after this one that involved a fraud scheme involving the sovereign citizen mentality. To call it a delusion is kind of tough, because these are firmly held political beliefs, and they simply don't believe that they're susceptible to government regulation. And I think that explains in part the district court's sentence. Remember, that sentence represented quite a bit of a departure from the advisory sentencing guidelines. Downwards, yes. And that was in part due to there was even an older gentleman who was in his 90s that was Sherwood Rodriguez, and the government did not feel it was worth pursuing trial on that, and so we wound up dismissing the case. And the judge, Judge Carlton, had a difficult time squaring a longer advisory guideline sentence for Mr. Calspeak when Mr. Rodriguez, who arguably was equally culpable as a founder of the scheme, wound up serving no time at all and didn't even suffer a criminal conviction. Okay. Thank you. Let's see. I wish to take just a moment, please. It seems to me, and I submit that the transfers themselves, the transfer of funds themselves were open and transparent, and perhaps they were designed to frustrate the court's turnover order, but that doesn't mean they were money laundering. It means simply that they were to frustrate the court's turnover order and to keep the funds from the attorney, who had no trouble finding, no trouble at all finding them.  I just wanted to, in the record, to show that Ms. Rowe, if this was indeed a scheme to launder money, it was, there's nothing to show that Ms. Rowe understood that the scheme to launder money, or the scheme, the transfer of funds at least, was designed to launder funds. It just isn't there. With respect to profits and the request or the lack of instruction clarifying profits, this Court and other courts, particularly since Santos, has spent a lot of ink and a lot of paper trying to define and to understand exactly what is meant by profits. To expect a jury to understand it without further clarification, without further instruction, seems to me to be a self-defeating purpose. Down to three minutes. The government argues that there was no evidence presented that there were any other sources of income for this group. However, it's their own witness and their own exhibits that demonstrate that there were other sources of income. And the government talks about numerous other bank accounts that they were aware of prior to trial, apparently, but they weren't discussed at trial, there was no evidence of them presented at trial, and they're not before this Court right now. As far as whether this issue of whether the funds came from specified unlawful activity is waived, one, I don't believe it is, but two, even if it is, it's purely a legal question that this Court can consider. Excuse me. At the Rule 29 motion, the defendants argued that there was insufficient evidence to satisfy the money laundering counts because it was not profits from specified unlawful activity. And at that point, this is where the government thinks that the defense should have expanded on that, and because they didn't, it's waived. However, at that point, the government had already rested, and so since the defense didn't present a case, there was no chance to present any more evidence for the government at that point because they had rested. So this is purely a legal argument that this Court can take up. And on that, I would submit. Okay. Thank you, counsel. We appreciate your arguments. That ends our session for this morning, and we'll be in recess until tomorrow. Thank you. Matter submitted.
judges: Fletcher, Noonan, Paez